**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
_____
                                )
DEIDRE HORNE,                    )
     On behalf of minor          )
     Child R.P.,                 )
                                 )
          Plaintiff,             )
                                 )
     v.                          )
                                 )   Civ. Action No. 15-115 (EGS)
                                 )
POTOMAC PREPARATORY P.C.S,        )
                                 )
          Defendant.             )
_____)
```

**MEMORANDUM OPINON**

Minor child R.P., a student at Potomac Preparatory Public

Charter School ("Potomac") from 2013 to 2015, was six years old

in March 2014 when he attempted to commit suicide by jumping out

of a school window because "he wanted to die." Compl., ECF No. 1

¶ 16. R.P.'s suicide attempt and more than fifteen other

disciplinary incidents took place after Potomac's November 2013

evaluation of R.P. Pl.'s Mem. Supp. Mot. Summ. J. ("Pl.'s Mem.

Supp.") ECF No. 10 at 2. In January 2014, Potomac concluded that

R.P. was not eligible to receive special education services

under the Individuals with Disabilities Education Improvement

Act ("IDEA"), 20 U.S.C. § 1400. *See* Compl. ¶ 13; Pl.'s Mem.

Supp. at 28. R.P.'s mother, Ms. Deidre Horne ("Ms. Horne"), made

several requests for a new evaluation and confirmed that she

would not withdraw her request for an independent evaluation.

Administrative Record ("AR"), ECF No. 9 at 506.[1] Nevertheless, Potomac did not initiate a hearing or agree to pay for an independent evaluation until August 2015 when, in response to Ms. Horne's due process complaint, Potomac filed a counterclaim seeking a ruling that its November 2013 evaluation was appropriate. Def.'s Resp. and Counterclaim, ECF No. 9, Ex. 1 at 19.

On October 26, 2014, a Hearing Officer ruled in favor of Potomac, finding that the school did not unnecessarily delay its response to Ms. Horne's request for a new evaluation and that Potomac's November 2013 evaluation was appropriate. Hearing Officer Determination ("HOD"), ECF No. 9, Ex. 6 at 94-98. In January 2015, Ms. Horne hired Dr. Natasha Nelson ("Dr. Nelson") to complete an independent evaluation of R.P. Pl.'s Mem. Supp. Ex. 10-2. Dr. Nelson concluded that R.P. "meets criteria to receive special education services under the category of Emotional Disturbance due to his diagnosis of Adjustment Disorder with Mixed Disturbance of Emotions and Conduct" and that R.P. should "receive an [Individualized Education Plan]." Pl.'s Mem. Supp., Ex. 2 at 12. In February 2015, Potomac officials refused to consider Dr. Nelson's evaluation. *Id.*, Ex.

---

[1] Exhibits 1-7 at ECF No. 9 constitute the Administrative Record. The AR page number can be found on the top right hand corner of each exhibit page.

3 at 10-3 at 2. In March 2015, Potomac considered an amended report from Dr. Nelson, but concluded that although R.P. continued to demonstrate behavioral problems, he did not qualify for services under the IDEA because "his behaviors do not impact his ability to make educational progress or access the general education." Def.'s March 2015 Eligibility Mtg. Notes, ECF No. 10, Ex. 5 at 3.

Pending before the Court are the parties' Cross Motions for Summary Judgment, which present two critical questions: (1) whether the Hearing Officer erred by finding that Potomac's response to Ms. Horne did not constitute unnecessary delay; and (2) whether the Hearing Officer erred by finding that Potomac's November 2013 evaluation was appropriate despite R.P.'s March 2014 suicide attempt and other disciplinary infractions between November 2013 and March 2014. *See generally* Pl.'s Mem. Supp.; Def.'s Mem. Supp. Summ. J., ECF No. 13. For the reasons discussed below, and upon consideration of the parties' briefing and oral arguments, Ms. Horne's Motion for Summary Judgment is **GRANTED in part and DENIED in part without prejudice.** Potomac's Motion for Summary Judgment is **DENIED** and the Hearing Officer's decision is **REVERSED.** The Court finds that the record before it supports the conclusion that R.P. qualifies for services under the IDEA as a student suffering from a severe emotional

disturbance and invites supplemental briefing on the issue of compensatory damages.

## I.    Background

### A.    Potomac's November 2013 Evaluation

R.P. began attending Potomac in the fall of 2013. Pl.'s Mem. Supp. at 2. Ms. Horne requested that R.P. be evaluated for special education services before the school year started based on a noticeable change in his attitude as a result of bullying he experienced at his previous school. *Id.* In October 2013, Potomac agreed to complete a psychological and functional behavioral assessment. *Id.* While these assessments were under advisement, R.P. was moved to a different classroom due to repeated disciplinary incidents. *Id.*

Potomac's school psychologist, Dr. Sharron Williams ("Dr. Williams"), completed cognitive, educational, visual-motor, and social-emotional tests, in addition to speaking with Ms. Horne and observing R.P. in the classroom. Williams' Eval., AR 261. When compared to his peers, R.P.'s cognitive abilities were assessed as average. *Id.* Dr. Williams concluded that R.P. was experiencing "transient emotional distress" related to "family transitions and traumatic events." *Id.* at 272. Although Dr. Williams concluded that these difficulties did not appear to interfere with his ability to access the general curriculum, she noted:

> Given that childhood is a period of cognitive,
> social, and emotional growth, [R.P.'s]
> behaviors should be monitored. If his
> behaviors increase in frequency and severity,
> a re-evaluation of his behavior and social-
> emotional functioning might be warranted.

*Id.* Although R.P. was not evaluated for any emotional
disturbance disorders, Dr. Williams concluded that he did not
qualify as having a learning disability or other health
impairment under the IDEA. *Id.* at 273.

Multi-Disciplinary Team ("MDT") meetings were held in December
2013 and January 2014 to discuss R.P.'s IDEA eligibility. HOD at
6, citing Ex. R-13, AR at 310-311. The MDT concluded that R.P.
was not eligible for service under the IDEA, but recommended
R.P. have a 504 plan and a behavior intervention plan, both of
which were developed in March 2014. Pl.'s Mem. Supp. at 2.[2]

## B.  R.P.'s persistent behavioral problems

Even after R.P's behavior plans were in place, he continued to
demonstrate significant behavioral problems. In March 2014, R.P.
attempted suicide by jumping out of a window at the school.
Potomac Incident Report, AR at 201. In addition, R.P. was
suspended six times and expelled four times between March 2014
and May 2014 for disciplinary incidents that typically involved

---

[2] Section 504 of the Rehabilitation Act of 1973 is designed to
assist students with learning or behavior problems even if they
do not qualify for an Individualized Education Plan (IEP) under
the IDEA. *See*
http://www2.ed.gov/about/offices/list/ocr/504faq.html.

R.P.'s physical assault of teachers and other students. Pl.'s Mem. Supp. at 2-4.

After R.P. attempted suicide, Potomac advised Ms. Horne to consult with a physician about R.P.'s suicidal ideation and required her to submit a letter to the school confirming that R.P. did not pose an immediate danger to himself. Potomac Notification Emerg. Conf., AR at 119. R.P. was evaluated by CHAMPS of Catholic Charities, a children and adolescent mobile psychiatric service. CHAMPS Evaluation, AR 120-25. CHAMPS assessed R.P. as suffering from adjustment disorder with mixed emotional disturbance. May 16, 2014, MDT Meeting Notes, AR at 129.

**C.      Ms. Horne's repeated requests for a new independent educational evaluation**

On March 31, 2014, Ms. Horne sent a letter to Potomac officials requesting an individualized education program ("IEP"). AR at 126. Ms. Horne noted that R.P.'s grades were going down and he was acting more aggressively. *Id.* She also noted that R.P.'s 504 and other behavior plans did not seem to be working in light of R.P.'s numerous suspensions. *Id.*[3] On May 7, 2104, Ms. Horne communicated with a Potomac official by email

_____

[3] Ms. Horne did not specifically request an Independent Education Evaluation ("IEE") at public expense in this communication, but Ms. Horne's intent to have R.P. re-evaluated based on ongoing behavioral problems and declining grades is clear. *Id.*

and specifically requested that the school pay for an Independent Education Evaluation ("IEE"). AR at 348. Potomac acknowledged Ms. Horne's IEE request and noted that it would be considered at the MDT meeting scheduled for May 16, 2014. *Id*. at 347.

A meeting was held on May 16, 2014, to discuss Ms. Horne's request. AR at 127. After that meeting, Potomac agreed via email to pay for an independent functional behavior assessment, but declined to fund an independent IEE. *Id*. at 140, 357, 538-39. Potomac explained that it would not fund an independent psychological evaluation because Ms. Horne

> [d]id not actually express disagreement with the comprehensive psychological evaluation completed by [Potomac]. Rather, she stated that she would like a new psychological evaluation in light of the fact that [R.P.] received a mental health diagnosis by an outside provider after the comprehensive psychological evaluation was completed. That is not a basis for requesting an independent educational evaluation under [the] IDEA.

*Id*. 140. Potomac requested that Ms. Horne withdraw her request for an IEE. *Id*. On May 20, 2014, Ms. Horne's attorney sent an email to Potomac officials indicating that Ms. Horne would not withdraw her request for an IEE at public expense:

> As indicated in my last email Ms. Horne does not agree with Dr. Williams' report and her conclusions, including but not limited to the report's conclusion that [R.P.'s] difficulties to not appear to adversely impact his ability to access the general curriculum.

> Furthermore, Dr. Williams' report seems to
> indicate that [R.P.]'s emotional issues can
> mostly be attributed to familial transitions
> and traumatic events. As Ms. Horne indicated
> at the last meeting, being that [R.P.] is the
> only one of her children exhibiting these
> types of behaviors, she does not agree with
> Dr. Williams' conclusions on this matter
> either. Ms. Horne continues to believe that
> [R.P.] qualifies under the IDEA as a student
> with an emotional disturbance who requires
> specialized instruction and related services
> in order to be able to access the general
> education curriculum.

*Id.* at 506. On May 23, 2014, Potomac's attorney indicated she was in the process of discussing the email with school officials. *Id.* at 508. On May 30, 2014, Potomac indicated it was "still undecided how to proceed with the request for an independent evaluation." *Id.* at 353. The school invited counsel and Ms. Horne to meet on June 13, 2014, to "discuss eligibility and revisions to the student's program." *Id.* By this time, Ms. Horne was no longer represented by counsel. *Id.* at 352.

R.P. was suspended for the last two weeks of the 2013-2014 school year. *Id.* at 582. During the summer of 2014, a new principal started at Potomac. HOD at 8. In July 2014, Ms. Horne met with the new principal to discuss R.P.'s disciplinary record. *Id.* Ms. Horne testified before the Hearing Officer that her request for an IEE was not discussed at that meeting. Hearing Tr., ECF No. 9, Ex. 7 ("Hearing Tr.") at 28. Rather, Ms. Horne recalled Potomac officials telling her R.P. would start

with a clean record the next school year. *Id.* Potomac's special education teacher testified that his "impression was that the functional behavior assessment that the school agreed to was – satisfied Ms. Horne and that there was – that issue [of an IEE] was resolved." *Id.* at 77.

>    **D.    Ms. Horne's due process complaint, Potomac's counterclaim, and the Hearing Officer's decision**

On August 1, 2014, Ms. Horne secured a new attorney who informed Potomac that because the school refused to authorize an IEE or file a due process complaint as required under 34 C.F.R. § 300.304(c)(4), Ms. Horne was going to have her son evaluated by an independent examiner and would seek reimbursement from the school. AR at 362-63. In response, the school invited Ms. Horne to another meeting. *Id.* On August 5, 2014, Ms. Horne filed a due process complaint requesting reimbursement for an IEE. *Id.* at 5. On August 15, 2014, Potomac filed a response and counterclaim arguing that its 2013 evaluation was appropriate. *Id.* at 465.

On October 26, 2014, the Hearing Officer issued his opinion concluding that Potomac's three-month delay in filing a due process complaint was not "unnecessary delay" because school officials were left with the impression that Ms. Horne was satisfied and no longer sought an IEE. HOD at 13. The Hearing Officer also concluded that Potomac's fall 2013 evaluation was appropriate. *Id.* at 97.

**E.    Events after the October 2014 Hearing Officer Determination**

In January 2015, Ms. Horne paid for an independent evaluation, which was completed by Dr. Nelson on January 20, 2015. Pl.'s Mem. Supp., Ex. 10-2. Dr. Nelson concluded that R.P. "meets criteria to receive special education services under the category of Emotional Disturbance due to his diagnosis of Adjustment Disorder with Mixed Disturbance of Emotions and Conduct." *Id*. at 12. Dr. Nelson recommend that R.P. "receive an IEP which will offer him inclusion supports in core academic classes for ten hours per week" and that R.P. "should receive support in his school in the form of counseling to address his behavioral, social, and emotional difficulties, for one hour per week." *Id*. Ms. Horne sent a copy of Dr. Nelson's report to Potomac. Pl.'s Mem. Supp. at 8.

In February 2015, R.P. was suspended again. Pl.'s Ex., ECF No. 10-3. On February 19, 2015, a "re-entry" meeting was held. *Id.* Potomac's new principal stated that the 504 plan was not working and that R.P. shows signs of being bipolar. *Id.* The principal asked if the team could review Dr. Nelson's evaluation. *Id.* The special education teacher refused to allow the principal to consider Dr. Nelson's report. *Id.*[4]

---

[4] The record includes no explanation or justification for the special education teacher's refusal to consider Dr. Nelson's report.

Dr. Nelson made an updated recommendation in March 2015. Pl.'s Ex., ECF No. 10-4. On March 27, 2015, Potomac held an eligibility meeting and reviewed Dr. Nelson's reports. *Id.* Potomac declined to find R.P. eligible for special education under the emotional disturbance classification. *Id.* The team agreed that while R.P. continued to demonstrate behavioral problems, his behavior did not impact his ability to make educational progress or access the general curriculum. *Id.* at 3.

## II. Standard of Review

The IDEA was enacted "to ensure that all children with disabilities have available to them a free appropriate public education ["FAPE"] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living...." 20 U.S.C. § 1400(d)(1)(A). A "free appropriate public education" must "sufficient[ly] confer some educational benefit upon the [ ] child." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley,* 458 U.S. 176, 200 (1982).

Under certain circumstances, parents have the right to an individualized educational evaluation at public expense. 34 C.F.R. § 300.502(b)(1)-(3). If a parent requests an independent educational evaluation at public expense, the public agency must "without unnecessary delay" either initiate a hearing to show that

its evaluation is appropriate or ensure that an independent educational evaluation is provided at public expense. *Id.*

If a parent or guardian objects to the identification, evaluation, or educational placement of the student, or the provision of a FAPE, the parent or guardian may seek an impartial due process hearing. 20 U.S.C. § 1415(b)(6)(A); § 1415(f)(1). This involves the parent or guardian filing a due process complaint, and then an independent Hearing Officer determining during the hearing whether the student received a free appropriate public education. *See id.* § 1415(f)(3)(E)(i). After the hearing, "[a]ny party aggrieved by the findings and decision ... shall have the right to bring a civil action with respect to the complaint presented [to the Hearing Officer]...." *Id.* § 1415(i)(2)(A).

The IDEA provides that the reviewing court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." *D.R. ex rel. Robinson v. District of Columbia*, 786 F.3d 1054, 1056 (D.C. Cir. 2015). A party that requests new evidence be considered by the Court need not file a motion. *See, e.g., Taylor v. District of Columbia*, 770 F. Supp. 2d 105, 111 n.7 (D.D.C. 2011) (noting that defendant failed to cite any support for the proposition

that plaintiff had to file a separate motion in support of the Court's consideration of additional evidence).

The Hearing Officer's decision in an IDEA case is afforded "less deference than is conventional in administrative proceedings." *Reid v. District of Columbia,* 401 F.3d 516, 521 (D.C. Cir. 2005). While a court must "engage in a more rigorous review of the decision below than is typical in administrative cases," it should "nevertheless accord the [h]earing [o]fficer's decision due weight[,]" and should not substitute its own view of sound educational policy for that of the Hearing Officer. *See Rowley,* 458 U.S. at 206, 102 S. Ct. 3034. The burden of proof is with the party challenging the administrative determination, who must "at least take on the burden of persuading the [C]ourt that the Hearing Officer was wrong." *Reid,* 401 F.3d at 521.

## III. Discussion

### A. Potomac's response to Ms. Horne's request for an IEE constituted unnecessary delay

Ms. Horne argues that Potomac's three-month delay from May to August 2014 in formally responding to her request for an IEE constitutes an unnecessary delay under 34 C.F.R. § 300.502(b)(2), and thus a violation of her rights under the

IDEA. Pl.'s Mem. Supp. at 18.[5] Potomac maintains the school's

personnel transitions and summer meetings with Ms. Horne justify

the delay. Def.'s Mem. Supp. at 12-13.

The IDEA provides that under certain circumstances, parents

have the right to an individualized educational evaluation at

public expense. Specifically:

(1) A parent has the right to an independent
    educational evaluation at public expense if
    the parent disagrees with an evaluation
    obtained by the public agency.

(2) If a parent requests an independent
    educational evaluation at public expense, the
    public agency **must, without unnecessary delay**,
    either—

    i.    Initiate a hearing under § 300.507
          to show that its evaluation is
          appropriate; or

    ii.   Ensure that an independent
          educational evaluation is provided
          at public expense, unless the agency
          demonstrates in a hearing under §
          300.507 that the evaluation
          obtained by the parent did not meet
          agency criteria.

(2) If the public agency initiates a hearing and
    the final decision is that the agency's
    evaluation is appropriate, the parent still

---

[5] The Court notes that as early as March 31, 2014, Ms. Horne sent
a letter to Potomac officials requesting that R.P.'s case be
reopened for the purposes of securing an individualized
education program ("IEP"). AR at 126. Notably, Ms. Horne did not
specifically request an IEE at public expense, but Ms. Horne's
intent to have R.P. re-evaluated based on ongoing behavioral
problems and declining grades is clear. *Id.*

has the right to an independent educational evaluation but not at public expense.

34 C.F.R. § 300.502(b)(1)-(3)(emphasis added).

In considering the administrative record in this case, the Hearing Officer focused on Ms. Horne's May 20, 2014 request for an IEE and the meetings between Ms. Horne and Potomac officials during the summer of 2014. The Hearing Officer concluded:

> Based on these circumstances, notably that from his meetings with Mother near the end of 2013-2014 school year, Special Education Director was left with the impression that the IEE request had been resolved, as well as the fact that Mother did not bring up her request for an IEE psychological evaluation in the July 2014 meeting with the new [Potomac] principal, I find that Petitioner has not established that there was unnecessary delay in [Potomac's] initiating the hearing to show that its evaluation of Student was appropriate.

HOD at 14. The Hearing Officer's conclusion is not supported by the record evidence and is incorrect as a matter of law.

Whether a school's actions under 34 C.F.R. § 300.502 constitute an "unnecessary delay" is an inquiry that must be addressed on a case-by-case basis. *J.P. ex rel., E.P. v. Ripon Unified School Dist.*, 2009 WL 1034993 at *7-8 (E.D. Cal. 2009) (citation omitted). The facts of each case are therefore critical.

Here, the administrative record shows that on May 7, 2014, Ms. Horne communicated with a Potomac official by email and requested that the school pay for an IEE. AR at 348. Ms. Horne was informed that her request would be discussed at the May 16, 2014 disciplinary meeting, which was scheduled to discuss R.P.'s ongoing behavioral problems. *Id.* at 347. Shortly after the meeting, on the same day, Potomac officials emailed Ms. Horne's attorney informing her that the school would not pay for an IEE. *Id.* at 140. Potomac also requested that Ms. Horne withdraw her request for an IEE, noting that "[i]f [Ms. Horne] is not willing to do so, Potomac Lighthouse will have to explore whether it is necessary to file a due process hearing request to establish the appropriateness of its evaluation." *Id.*

On May 20, 2014, Ms. Horne's attorney sent an email to Potomac officials indicating that Ms. Horne refused to withdraw her request for an IEE at public expense. *Id.* at 506. On May 23, 2014, Potomac's attorney indicated she was in the process of discussing the email with school officials. *Id.* at 508. On May 30, 2014, Potomac indicated it was "still undecided how to proceed with the request for an independent evaluation." *Id.* at 353.

From May 20, 2014 to early August 2014, Ms. Horne was unrepresented by counsel. *Id.* at 352. After Potomac's May 30, 2014 email, no further communication was received by Ms. Horne

from Potomac about her request for an IEE until August 2014 when Ms. Horne retained new counsel. During the summer of 2014, Ms. Horne met with school officials to discuss R.P.'s behavioral issues. HOD at 8. Her request for an IEE was never discussed and she testified before the Hearing Officer that she did not withdraw her request for an IEE. Hearing Tr. at 28.

Based on this record, the Hearing Officer's analysis is faulty in several respects. First, the Hearing Officer erred by focusing on May 20, 2014 as the date that Ms. Horne requested an IEE, without analyzing the events that took place prior to that date. Specifically, the Hearing Officer failed to acknowledge Ms. Horne's May 7, 2014 request and the email communication between Ms. Horne's attorney and Potomac thereafter. When Ms. Horne refused to withdraw her request for an IEE on May 20, 2014, Potomac was required to initiate a hearing to show that its November 2013 evaluation was appropriate. 34 C.F.R. § 300.502(b)(2).

Second, the Hearing Officer failed to critically review the cases cited by Potomac. In its briefing before the Hearing Officer and before this Court, Potomac points to *Ripon* and *L.S. ex rel. K.S. v. Abington School Dist.* to support its argument that meetings between Ms. Horne and Potomac staff during the 2014 summer support a finding that there was no unnecessary delay. 2009 WL 1034993 at *7-8 (E.D. Cal. 2009); 2007 WL 2851268

at *8 (E.D. Penn. 2007). Both of these cases are distinguishable.

In *Ripon*, the parties "continued to discuss provision of an IEE through series of letters" after the school received the IEE request. 2009 WL 1034993 at *7-8. The Court therefore concluded that the parties "did not come to a final impasse" in regard to the provision of an IEE until three weeks before the school filed a due process report. *Id. Abington* is similarly distinguishable. In *Abington*, parents of the student at issue argued that a six-week delay from the time the parents made their IEE request until the school filed a due process complaint constituted unnecessary delay. 2007 WL 2851268 at *8. The Court concluded that the six week delay was not unnecessary as it was "largely comprised of the District's efforts to resolve the dispute and move the process along." *Id.* at *9.

The facts of this case are distinguishable from *Ripon* and *Abington* because the parties reached a final impasse and there was no dispute left to resolve on March 20, 2014, when Ms. Horne refused to withdraw her request for an IEE. Potomac argues that "[t]he evidence in the administrative record that was before the Hearing Officer made it clear that Defendant was trying to resolve the Plaintiff's concerns amicably between the time that she requested an IEE and the end of the school year, during which she ceased being represented . . . ." Def.'s Mem. Supp. at

14. Potomac's argument fails because its effort to resolve Ms. Horne's concerns amicably ended on May 16, 2016, when it communicated to Ms. Horne that the school would not fund an IEE. Ms. Horne refused to withdraw her request for an IEE, and as Potomac acknowledged in its May 16, 2014 email, Ms. Horne's decision left Potomac with one choice under the law: "to file a due process hearing request to establish the appropriateness of its evaluation." AR at 140.

Indeed, the facts of this case are consistent with cases finding unnecessary delay where the school allowed significant time to pass without explanation before responding to a parent's request for an IEE. *See, e.g.*, *Pajaro Valley Unified Sch. Dist. v. J.S.*, Case No. 06-0380 PVT, 2006 WL 3734289, at *3 (N.D. Cal. Dec. 15, 2006) (finding unnecessary delay where school district provided no explanation for its three month delay after IEE request before school filed for a due process hearing so that it could demonstrate that its own evaluation was appropriate); *M.M. v. Lafayette Sch. Dist.*, Case Nos. 09-4624 and 10-04223, 2012 WL 3257662, at *10 (N.D. Cal. Aug. 8, 2012) (finding unnecessary delay where school district waited 74 days after IEE request to file for due process hearing).

Finally, the Hearing Officer erred by relying on the testimony of Potomac's Director of Special Education who had the "impression" that Ms. Horne was satisfied at the end of the

2013-2014 school year. HOD at 13. The Hearing Officer's
acceptance of Potomac's argument that this "impression" was
furthered because Ms. Horne did not raise the issue of an IEE
during her meetings with Potomac staff during the summer of 2014
places an improper burden on Ms. Horne to do more than simply
request an IEE. The IDEA does not require a parent to do more
than request an IEE. In fact, the law prohibits schools from
requiring an explanation from parents:

> If a parent requests an independent
> educational evaluation, the public agency may
> ask for the parent's reason why he or she
> objects to the public evaluation. However, the
> public agency may not require the parent to
> provide an explanation and may not
> unreasonably delay either providing the
> independent educational evaluation at public
> expense or filing a due process complaint to
> request a due process hearing to defend the
> public evaluation.

34 C.F.R. § 300.502(b)(4). Once a parent requests an IEE, the
law requires that the school act "without unnecessary delay" to
either fund the IEE or demonstrate that its evaluation was
appropriate. 34 C.F.R. § 300.502(b)(1)-(3). As explained by the
Supreme Court, the IDEA:

> [e]nsures parents' access to an expert who can
> evaluate all the materials that the school
> must make available, and who can give an
> independent opinion. They are not left to
> challenge the government without a realistic
> opportunity to access the necessary evidence,
> or without an expert with the firepower to
> match the opposition.

*Schaffer ex. Rel. Schaffer v. Weast*, 546 U.S. 49 (2005).

For all of these reasons, the Hearing Officer erred in concluding that Potomac's response to Ms. Horne's request for an IEE was not unnecessarily delayed. Ms. Horne is therefore entitled to reimbursement for the cost of Dr. Nelson's evaluation. *See* 34 C.F.R. § 300.502; *Jefferson Cty. Bd. of Educ. v. Lolita S.*, 581 F. App'x 760, 765-66 (11th Cir. 2014) (finding that parent was entitled to reimbursement for outside evaluation when school district failed to file its own due process request to determine whether its evaluation was appropriate).

**B. Potomac's November 2013 evaluation was not appropriate in light of R.P.'s ongoing behavioral problems**

Potomac argues that Ms. Horne's disagreement with the conclusion of Potomac's November 2013 assessment of R.P. is "not sufficient to justify an IEE at public expense" or to show that Potomac's assessment was inappropriate. Def.'s Mem. Supp. at 20. Rather, Potomac argues that Ms. Horne must point to some error in the methodology of Ms. Williams' assessment to show that it was inappropriate. *Id.* Ms. Horne contends that Potomac was legally obligated under the Child Find provision of the IDEA to reevaluate R.P. based on his suicide attempt, repeated disciplinary infractions, and diagnosed adjustment disorder. Pl.'s Mem. Supp. at 12. To this end, Ms. Horne argues that the Hearing Officer erred by reviewing the methodology of the 2013

evaluation without considering events that occurred from November 2013 to May 2014. *Id.*

The Hearing Officer concluded that Ms. Williams' November 2013 evaluation of R.P. was reliable and that Ms. Horne "offered no evidence . . . that the 2013 psychological evaluation was not sufficiently comprehensive to identify Student's needs or that School Psychologist did not adequately gather functional, developmental and academic information about [R.P.'s needs]." *Id.* at 97.[6] The Hearing Officer also noted that "whether the School Psychologist's conclusions were correct or whether the student should have been determined eligible for special education services, i.e., whether he is a child with a disability in need of special education and related services, are not issues before me." HOD at 15-16.

Potomac insists the question of whether its Child Find obligation was violated and whether R.P. is in fact entitled to benefits under the IDEA were waived by Ms. Horne because she did not explicitly raise these issues during the administrative hearing. Def.'s Mem. Supp. at 15, n2 (citing *Roark ex rel. Roark v. Dist. of Columbia*, 460 F. Supp. 2d 32, 43 (D.D.C. 2006)

---

[6] Although the Hearing Officer recognized that Potomac had the burden of showing its evaluation was appropriate, the Hearing Officer appears to shift the burden to Ms. Horne to produce some evidence that Potomac's evaluation was faulty. *Compare* HOD at 14 and 15.

("[T]his Court cannot address an issue that was not first presented to the Hearing Officer.")). Ms. Horne argues that Potomac's failure to meet its Child Find obligation was clearly raised during the cross examination of Ms. Williams, which explicitly addressed Ms. Williams' lack of knowledge about R.P.'s suicide attempt and other disciplinary problems. Pl.'s Reply Mem., ECF No. 15 at 10. In the Court's view, because Ms. Horne requested an IEE at public expense due to R.P.'s ongoing behavioral issues and her disagreement with Potomac's conclusion that he did not suffer from an emotional disturbance that qualified him for services under the IDEA, the question of whether Potomac complied with its Child Find obligation was properly before the Hearing Officer on Potomac's claim that its November 2013 evaluation was appropriate.

Regardless, Potomac fails to acknowledge that the case law cited in support of its waiver argument also recognizes that exhaustion is not necessary where there is evidence that "an attempt was made to raise the issue before the Hearing Officer" or that "exhaustion would be futile or inadequate." *Roark*, 460 F. Supp. 2d at 43; *see also Honig v. Doe*, 484 U.S. 305, 327 (1998) ("Parents may bypass the administrative process where exhaustion would be futile or inadequate."). This case presents a unique procedural posture in that Potomac's charter was unanimously revoked by the District of Columbia School Board on

February 13, 2016. Pl.'s Opp. Def.'s Mot. Continue, ECF No. 19
at 1. Revocation was first recommended by the Board in December
2014, but Potomac was given an opportunity to meet certain
academic achievement benchmarks during the 2014-2015 and 2015-
2016 school years. *Id.* at 2. Potomac failed to meet the academic
benchmarks, citing a 300 percent increase in its special
education population as justification for its failure. *Id.*
Nevertheless, the Charter School Board voted to revoke Potomac's
charter because Potomac fell below the academic quality of D.C.
public charter schools and the number of special education
students was within the normal range for D.C. charter schools.
*Id.* To the extent Ms. Horne did not fully exhaust her claim
related to Potomac's Child Find obligation, it would be futile
to remand or otherwise require exhaustion of that claim under
these circumstances because Potomac is likely to be fully
dissolved by November 2016. Def.'s Reply Pl.'s Opp. Mot.
Continue, ECF No. 20 at 2. Ensuring that R.P. receives
appropriate services this fall when he begins attending his
local D.C. public school is of utmost concern to the Court.
Draft Hearing Tr. 11:19-21. Time is therefore of the essence and
the Court is best positioned to ensure R.P.'s rights under the
IDEA are protected.[7] *See Branham v. Gov. of the Dist. of*

---

[7] The Court also notes that even if it could be found that Ms.
Horne did not properly raise a Child Find argument through the

24

*Columbia*, 427 F.3d 7 at 13 (D.C. Cir. 2005) (ordering district court to address preferred plan for student rather than remanding to Hearing Officer where student "had spent four years without a FAPE" but there "was still time to help [the student]").

For the reasons discussed below, the record that was before the Hearing Officer supports the conclusion that Potomac violated its Child Find obligation by not reevaluating R.P. after his suicide attempt. Further, the Administrative Record, coupled with the additional evidence presented by Ms. Horne, also supports a finding that R.P. qualifies for services under the IDEA due to an emotional disturbance.

**1. Potomac violated its Child Find obligation**

Potomac was obligated under the Child Find provision of the IEDA to identify R.P. as a child with a disability. The IDEA's Child Find obligation places an affirmative duty on Local Education Associations ("LEAs") to identify children with disabilities:

> All children with disabilities residing in the State, including children with disabilities who are homeless children or are wards of the State and children with disabilities attending private schools, regardless of the severity of

---

cross examination of Ms. Williams, the Court has the authority to rule on the issue because it is a legal issue. *Lester H. by Octavia P. v. Gilhool*, 916 F.3d 865, 869-70 (3d Cir. 1990) (holding that parents may bypass the administrative process "where the issue presented is purely a legal question.")

> their disabilities, and who are in need of
> special education and related services, are
> identified, located, and evaluated and a
> practical method is developed and implemented
> to determine which children with disabilities
> are currently receiving needed special
> education and related services.

20 U.S.C.A. § 1412. The Child Find obligation extends to all children who are *suspected* of having a qualifying disability under IDEA. 34 C.F.R. § 300.111 (c)(1) ("Child find also must include children who are suspected of being a child with a disability ...").*; see also N.G. v. Dist. of Columbia*, 556 F. Supp. 2d 11, 25-26 (D.D.C. 2008). An LEA's duty to locate and conduct an evaluation of a student starts "as soon as a student is identified as a *potential* candidate for special education services." *Id; see, e.g., District of Columbia v. Abramson,* 493 F.Supp.2d 80, 85 (D.D.C. 2007) (explaining that once a child is identified the local educational agency "is then obligated to move forward with the requirement of [IDEA] § 1414(a)(1) and determine whether the student is in fact a child with a disability").

In this case, Ms. Williams' November 2013 evaluation specifically noted that R.P. may need to be reevaluated if his behavioral problems continued:

> Given that childhood is a period of cognitive,
> social, and emotional growth, [R.P.'s]
> behaviors should be monitored. If his
> behaviors increase in frequency and severity,

> a re-evaluation of his behavior and social-
> emotional functioning might be warranted.

AR at 272. Yet, Ms. Williams testified before the Hearing
Officer that she was not aware of R.P.'s suicide attempt or
repeated suspensions and expulsions. Hearing. Tr., ECF No. 9,
Ex. 7 at 66-68. There is no dispute, however, that Potomac was
aware of R.P.'s suicide attempt. In fact, Ms. Horne was required
to submit a letter to the school confirming that R.P. did not
pose an immediate threat to himself. CHAMPS assessment, ECF No.
9, Ex. 2 at 45-50. The CHAMPS evaluation also diagnosed R.P.
with adjustment disorder with mixed emotional disturbances, a
diagnosis Potomac refused to consider. *Id.* Because R.P.'s
suicide attempt put Potomac on notice that he was potentially
suffering from a disability that would qualify him for services
under the IDEA, Potomac's failure to reevaluate R.P. at that
time violated the Child Find provision of the IDEA. *See, e.g.*
*Integrated Design and Elec. Acad. Pub. Charter Sch. v. McKinley*,
570 F. Supp.2d 28, 35 (D.D.C. 2008) (holding that student's
suicide attempt at school triggered Child Find obligation).

**2. The record evidence supports the conclusion that R.P.
qualifies for services under the IDEA due to an emotional
disturbance**

Had Potomac complied with its Child Find obligation and
reevaluated R.P. after his suicide attempt, the evidence would
have supported a finding that R.P. suffered from an emotional

disturbance and qualified for services under the IDEA. Under the IDEA, a child with a disability means:

> (1) . . . a child evaluated in accordance with §§ 300.304 through 300.311 as having mental retardation, a hearing impairment (including deafness), a speech or language impairment, a visual impairment (including blindness), **a serious emotional disturbance (referred to in this part as "emotional disturbance")**, an orthopedic impairment, autism, traumatic brain injury, an other health impairment, a specific learning disability, deaf-blindness, or multiple disabilities, and who, by reason thereof, needs special education and related services.

34 C.F.R. § 300. An emotional disturbance under the IDEA means:

> (4)(i) . . . a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance:
>
> > (A) An inability to learn that cannot be explained by intellectual, sensory, or health factors.
> >
> > (B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.
> >
> > (C) Inappropriate types of behavior or feelings under normal circumstances.
> >
> > (D) A general pervasive mood of unhappiness or depression.

> (E)  A tendency to develop physical
>       symptoms or fears associated with
>       personal or school problems.

34 C.F.R. § 300.8. At a minimum, R.P. demonstrated inappropriate

behavior (attempting to jump out a window for the stated reason

of killing himself) under normal circumstances (while at

school). 34 C.F.R. § 300.8(c); *see McKinley*, 570 F. Supp. 2d at

35 (D.D.C. 2008) (holding that an attempted suicide constitutes

inappropriate behavior or feelings under normal circumstances);

*N.G.*, 556 F. Supp. 2d at 27 (same).

In addition, the record evidence also supports a finding

that R.P. was unable to build or maintain satisfactory

interpersonal relationships with peers and students and that he

generally had a pervasive mood of unhappiness. R.P. had thirty-

one documented incidents of behavioral problems at school from

September 2013 to February 2015. Pl.'s Mem. Supp. at 28. Most of

these incidents demonstrate R.P.'s inability to build or sustain

interpersonal relationships. For example, in October 2013, R.P.

was suspended for ten days for physically attacking a teacher

when R.P. was in the library without permission. *Id.* at 30. R.P.

twisted the teacher's hand behind her back, scratched her arm,

and pushed her into a bookshelf. *Id.* In February 2014, R.P.

pushed a teacher, hit a student over the head with a three-hole

puncher, and pushed another student to the ground. *Id.* In April

2014, R.P. had to be physically restrained multiple times for repeatedly assaulting another student throughout the day. *Id.* at 31. Several incidents also reflect a pervasive mood of unhappiness. R.P. first tried to commit suicide in March 2014. *Id.* at 31. R.P. attempted to jump out of a window at school and had to be physically restrained. *Id.* After the incident, R.P. stated that "he wanted to die." *Id.* In February 2015, during a meeting about R.P.'s suspensions, R.P. stated, "I want to kill myself and I hate my life." *Id.* at 32.

Based on the full record before the Court, and consistent with Dr. Nelson's January 2015 evaluation, the Court finds that R.P. "meets criteria to receive special education services under the category of Emotional Disturbance due to his diagnosis of Adjustment Disorder with Mixed Disturbance of Emotions and Conduct." Pl.'s Mem. Supp., Ex. 10-2 at 12. Dr. Nelson recommends that R.P. "receive an IEP which will offer him inclusion supports in core academic classes for ten hours per week" and that R.P. "should receive support in his school in the form of counseling to address his behavioral, social, and emotional difficulties, for one hour per week." *Id.*

According to Plaintiff's counsel, R.P. will be attending his local District of Columbia public school ("DCPS") this fall. Draft Hearing Tr. 11:19-21. As recognized by the United States Court of Appeals for the D.C. Circuit, "the IEP is the vehicle

through which school districts typically fulfill their statutory obligation to provide a free appropriate public education and that officials must have an IEP in place for each student with a disability '[a]t the beginning of each school year.'" *Legget v. District of Columbia*, 793 F.3d 59, 67 (D.C. Cir. 2015) (citing 20 U.S.C. § 1414(d)(2)(A)).[8] The Court strongly encourages Ms. Horne to consult with her attorney to ensure that R.P.'s right to a FAPE is implemented through an appropriate IEP in accordance with the IDEA.

### IV. Conclusion

For all of these reasons, Ms. Horne's Motion for Summary Judgment is **GRANTED** and Potomac's Motion for Summary Judgment is **DENIED**. An appropriate Order accompanies this Memorandum Opinion.


**Signed:**     **Emmet G. Sullivan**
            **United States District Judge**
            **July 20, 2016.**

---

[8] To the extent Ms. Horne seeks retrospective relief for Potomac's IDEA violations, the burden is on Ms. Horne to seek an evidentiary hearing on that issue as the record before the Court is insufficient to conduct the "qualitative, fact-intensive" analysis required to determine the sort of compensatory education that may be appropriate in this case. *See Branham*, 427 F.3d at 11 (citing *Reid*, 401 F.3d at 527). Plaintiff shall also file supplemental briefing, including citation to appropriate legal authority, regarding its request for attorney's fees.